676 S.E.2d 690

The STATE, Respondent,

v.

Brandi L. HOLDER, Appellant.

No. 26644.

Supreme Court of South Carolina.

Heard March 18, 2009.

Decided May 4, 2009.

Deputy Chief Appellate Defender for Capital Appeals Robert M. Dudek, of South Carolina Commission on Indigent Defense, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Norman Mark Rapoport, of Columbia; and Solicitor Robert Mills Ariail, of Greenville, for Respondent.

Justice BEATTY.

Brandi L. Holder was convicted of homicide by child abuse for the death of her son, Bobby (Bo) Holder, and was sentenced to twenty-five years in prison. Holder appeals, arguing the trial court committed reversible error (1) in allowing a police investigator to testify regarding statements made by a codefendant during interrogation, (2) in admitting testimony from a coworker regarding her behavior, (3) in admitting autopsy photographs, and (4) in admitting photographs taken of her son one month before his death that suggested prior abuse. We affirm.

## I. FACTS

Holder's son, Bo, was born on January 3, 2000. Holder started working at a hair salon in January 2002, and she thereafter met Mark Martucci, who worked at a carpet store next door. Holder and her son moved in with Martucci sometime in early 2002. Martucci was not Bo's biological father.

Between 12:00 p.m. and 1:00 p.m. on Wednesday, July 17, 2002, Bo, who was two-and-a-half years old, was brought unconscious to the emergency room at Allen–Bennett Hospital in Greenville, South Carolina by Martucci and another man,

identified as John Parker.[1]  Bo was not breathing and had no heartbeat.  Martucci told hospital personnel that Bo had fallen off an All–Terrain Vehicle (ATV) earlier that week and had injured himself.  When Holder later arrived at the hospital, she also told hospital personnel that Bo had been involved in an ATV accident.

Extensive efforts were made to resuscitate Bo, but they were unsuccessful and he was pronounced dead.  Dr. Michael Eugene Ward, a pathologist who conducted the autopsy of Bo, testified that Bo's injuries were not caused by an accident. Bo had bruising in the pattern of knuckle marks on his face, and the inside of his lip had been split.  Bruising was present around his mouth and face.  Bo also had numerous bruises all over his body that were in various stages of healing.  Dr. Ward concluded Bo died as a result of blunt force trauma to the abdomen.  Specifically, Bo sustained trauma to the visceral organs of his abdomen with a tear in the small intestine, trauma to his pancreas, and bleeding into the abdominal cavity that caused his body to shut down.

Holder gave a statement to the police initially denying any knowledge of abuse.  When she was told by investigators that they had discovered there had been no ATV accident, Holder indicated that she wanted to tell what had happened and she gave a second statement in which she admitted having knowledge of repeated incidents of Martucci's abuse of Bo.[2]

At a joint trial, Holder and Martucci were convicted of homicide by child abuse in the death of Bo.  Holder was sentenced to twenty-five years in prison.  Martucci did not appear for trial, so his sentence was sealed.  Martucci subsequently appeared to receive his sentence and was ordered to serve life in prison.  *See State v. Martucci,* 380 S.C. 232, 669 S.E.2d 598 (Ct.App.2008).

---

1.  Parker, who had been staying with Martucci and Holder, pled guilty to aiding and abetting homicide by child abuse and testified at the trial in this matter.  Parker stated he had repeatedly urged Martucci to take Bo to the hospital on the morning of Bo's death, but Martucci had initially refused.  Parker also testified that he had witnessed Martucci abusing Bo on several occasions.

2.  At trial, Holder repudiated her police statement in which she admitted knowledge of abuse, maintaining it had been fabricated by the authorities.

## II.  LAW/ANALYSIS

"A person is guilty of homicide by child abuse if the person . . . causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life."  S.C.Code Ann. § 16–3–85(A)(1) (2003).

"Child abuse or neglect" is defined for purposes of the statute as "an act or omission by any person which causes harm to the child's physical health or welfare."  *Id.* § 16–3–85(B)(1).  "Harm to the child's physical health or welfare" occurs when someone "inflicts or allows to be inflicted upon the child physical injury, including injuries sustained as a result of excessive corporal punishment."  *Id.* § 16–3–85(B)(2)(a).

### (A)  Statements by Codefendant

■    Holder asserts the trial court erred in allowing Doug Kelly, an investigator with the Greenville County Sheriff's Office, to relate what codefendant Martucci told him during interrogation.  Martucci's redacted oral statement was allowed in to the effect that he had noticed some bruises on Bo, and "he felt like she had been inflicting them."  Holder contends her Sixth Amendment right to confront and cross-examine witnesses was denied, citing *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because Martucci did not testify at trial.  Holder alleges the redaction of Martucci's statement was insufficient in this case.

■    The Confrontation Clause of the Sixth Amendment, which was extended to the states by the Fourteenth Amendment, guarantees the right of a criminal defendant to confront witnesses against him, and this includes the right to cross-examine witnesses.  *Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

In *Bruton,* the Supreme Court held that, in a joint trial, admission of a non-testifying codefendant's statement that expressly inculpates the defendant violates the defendant's rights under the Confrontation Clause, as the use of only a limiting instruction is insufficient to remove any prejudice to the defendant.  391 U.S. at 136–37, 88 S.Ct. 1620.

In *Richardson,* the Supreme Court remarked that the rule announced in *Bruton* is a "narrow" one that applies only when the statement implicates the defendant "on its face"; the rule does not apply where the statement becomes incriminating only when linked to other evidence introduced at trial, such as the defendant's own testimony. *Richardson,* 481 U.S. at 207–08, 107 S.Ct. 1702. The Supreme Court also noted *Bruton* can be complied with by the use of redaction:

> Even more significantly, evidence requiring linkage differs from evidence incriminating on its face in the practical effects which application of the *Bruton* exception would produce. If limited to facially incriminating confessions, *Bruton* can be complied with by redaction—a possibility suggested in that opinion itself. *Id.,* at 134, n. 10, 88 S.Ct., at 1626, n. 10. If extended to confessions incriminating by connection, not only is that not possible, but it is not even possible to predict the admissibility of a confession in advance of trial.

*Id.* at 208–09, 107 S.Ct. 1702.

In *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), a 5–4 decision, the Supreme Court considered *Bruton*'s application when the redaction consists of replacement of the defendant's name with an obvious blank space, a symbol, or a word such as "deleted." The Court noted the *Richardson* decision had limited the scope of *Bruton* to instances where the reference to the defendant was on the face of the statement. However, the majority in *Gray* held that a statement that "substituted blanks and the word 'delete' for the petitioner's proper name[ ] falls within the class of statements to which *Bruton*'s protections apply." *Id.* at 197, 118 S.Ct. 1151.

The majority reasoned that one must look at the *kind* of inferences that are necessary to make a connection to the defendant, not the simple *fact* that there are inferences, to determine the applicability of *Bruton.* *Id.* at 196, 118 S.Ct. 1151. *Richardson* involved statements that did not directly refer to the defendant, but which became incriminating only when linked to other evidence developed at trial. *Id.* at 196, 118 S.Ct. 1151. However, the *Gray* Court stated "[t]he inferences at issue here [in *Gray* ] involve statements that, despite

redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even [if the statement was] the very first item introduced at trial." *Id.* Thus, the statements are protected under *Bruton* because in such instances the defendant is implicated almost as if there was a direct reference, and the connection does not depend on other evidence introduced at trial. *Id.* at 196–97, 118 S.Ct. 1151.

Violations of the Confrontation Clause are subject to a harmless error analysis. *State v. Murphy,* 270 S.C. 642, 644, 244 S.E.2d 36, 36–37´(1978) (observing where a wealth of evidence exists against the appellant, it eliminates any error in the admission of a codefendant's statement). "A [C]onfrontation [C]lause error is harmless if the evidence is overwhelming and the violation so insignificant by comparison that we are persuaded, beyond a reasonable doubt, that the violation did not affect the verdict." *State v. Vincent,* 131 Wash.App. 147, 120 P.3d 120, 124 (2005). "Considerations include the importance of the witness's testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case."[3] *Id.*

In the current appeal, Holder argues the substitution of her name with the pronoun "she" was insufficient to obscure her identity because the jury could readily determine that the statement referred to her as she was the only female defendant. We find the redaction in this case is analogous to that discussed in *Gray* because, despite the redaction, it was apparent that Martucci was referring to Holder, and this inference was one that could be readily made even without

---

3. In *Vincent,* the Washington Court of Appeals stated that, although the use of "the other guy" had been upheld as a proper substitution in previous cases, the exact words used for redaction must be evaluated in context to determine whether the reference to the defendant was adequately obscured. Thus, there could be some instances where this identical phrase would not be sufficient, such as where the implication of the defendant is apparent. The court concluded, however, that any error in this case was harmless beyond a reasonable doubt because the evidence of the defendant's guilt was overwhelming and the disputed statement was merely cumulative to other, admissible evidence. *Id.* at 156–57, 120 P.3d 120.

reliance on the other testimony developed at trial. Thus, we find the admission of the redacted statement violated Holder's rights under the Confrontation Clause as Martucci did not testify and was not subject to cross-examination.

■ However, even though the redacted statement was admitted in error, we hold the error was harmless beyond a reasonable doubt in the context of the entire record. Holder admitted in her own statement to the police that she observed numerous instances where Martucci abused her child, including dunking him in the bathtub to stop him from crying while he gasped for air; striking him on the legs, back, and face; and taping his mouth shut, among other things. In her police statement, Holder stated Martucci's abuse of Bo began when Martucci lost his job and he began babysitting Bo.

Holder also initially told hospital personnel that Bo was injured in an ATV accident, and then later admitted there was no accident. Holder was at home with Martucci and her son on the Sunday, Monday, and Tuesday prior to her son's death on Wednesday, July 17, 2002, so she was present during the time frame the pathologist testified the fatal injuries occurred. According to the medical authorities, Bo's distress would have been acute and impossible to ignore, and had Bo been taken to the hospital when the injuries occurred, he could have been saved. This failure to timely seek medical attention for Bo is evidence of extreme indifference to human life.

Coworkers and neighbors also testified that they had seen bruising on Bo while he was in the company of Holder and that they had voiced their concerns to her. In fact, Holder was present when a neighbor took photographs to document the injuries. Holder also fabricated statements to coworkers and even to hospital personnel on the day of her son's death to hide the true source of Bo's injuries. Thus, Holder undoubtedly was aware of and was complicit in the severe abuse of her son, leading to his eventual death by beating at the age of two-and-a-half years. Thus, it was established beyond a reasonable doubt that Holder was guilty of the offense of homicide by child abuse independent of the challenged statement so the error was harmless in the context of the entire record.

### (B) Coworker's Testimony Regarding Holder

Holder next contends the trial court erred in allowing a coworker, Angela Eccles, to testify that Holder began dressing differently and talked less about her child once her relationship began with Martucci. Holder argues the testimony was inadmissible character evidence under Rule 404(a) of the South Carolina Rules of Evidence (SCRE) because it implied Holder "was acting in conformity with this bad trait of her character by putting her relationship with Martucci ahead of her own child's best interests."

Eccles testified that she is a hair stylist at Capelli's Hair Salon in Mauldin and had worked there for seven years. Holder started working at the salon in January 2002. Mark Martucci worked at a carpet store next door. Martucci was one of Holder's first clients, and Eccles was aware that the two had developed a relationship and moved in together.

Eccles stated that when Holder brought her son, Bo, to the salon for a haircut in early July 2002, she noticed that Bo "had bruises along the sides of his face." Her impression, based on his appearance, was that somebody had squeezed his face. Eccles asked Holder about it, and Holder said her son had been pushed into a swimming pool by a dog at the home of Martucci's sister. Eccles testified that Holder "added that she wouldn't have believed it herself, except it got caught on video because Mark's sister was videotaping at the time." [4]

Eccles said that during this July visit to the salon, Holder's son seemed upset compared to the three or four times she had previously seen him and he was crying. Holder told her son, "You better behave or I'm going to take you home to Mark." At that point, the child fell to the floor and cried and screamed, which Eccles said concerned her because she "thought it was odd."

When asked to generally describe Holder during the time she worked with her, Eccles stated:

When she first started working there, she talked more about Bo and—it's hard to explain. She was a little more soft-spoken. She dressed a little more conservatively. And over a period of weeks, it started to change, especially now

---

4. No videotape of this alleged event was offered at trial.

looking back at the change of her dress. She started dressing a little different.

Defense counsel objected to this last response quoted above, summarily stating, "reasonable objection under Rule 404, Your Honor, placing her character in evidence." The trial court overruled the objection. Eccles concluded her testimony on this particular point by stating that Holder did not talk as much about Bo and starting talking about "Mark, Mark, Mark" basically "all the time" once they met. She stated she did "know if it's just because we're all moms, but we [the other salon employees] all talk[ed] about our kids, kids, kids."

Eccles later testified, without objection, that Holder had stopped speaking to her parents, although Holder said they had tried to call her. Eccles stated, "I don't remember if it was her or Mark that had told her she didn't need to talk to them or if she herself just did not want to have anything to do with them anymore."

The State contends the testimony was relevant to Holder's state of mind as it was required to prove that Holder caused the death of her child while committing abuse or neglect, and the death occurred under circumstances manifesting an extreme indifference to human life. Thus, the evidence about Holder's relationship with Martucci, her changed appearance, and her failed relationship with her parents [5] was relevant to Holder's state of mind.

■ "The admission or exclusion of testimonial evidence falls within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent abuse resulting in prejudice." *State v. Brannon*, 341 S.C. 271, 277, 533 S.E.2d 345, 348 (Ct.App.2000).

"Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Rule 404(a), SCRE. An exception to this rule exists for "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same." *Id.* Rule 404(a)(1).

---

**5.** No objection was made to the testimony concerning Holder's relationship with her parents.

"The term 'character' refers to a generalized description of a person's disposition or a general trait such as honesty, temperance or peacefulness." *State v. Nelson*, 331 S.C. 1, 7, 501 S.E.2d 716, 719 (1998). "Generally speaking, character refers to an aspect of an individual's personality which is usually described in evidentiary law as a 'propensity.'" *Id.* (citations omitted).

"A person is guilty of homicide by child abuse if the person ... causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an *extreme indifference* to human life." S.C.Code Ann. § 16–3–85(A)(1) (2003) (emphasis added).

For purposes of the homicide by child abuse statute, "extreme indifference" has been defined as "a mental state akin to intent characterized by a deliberate act culminating in death." *McKnight v. State*, 378 S.C. 33, 48, 661 S.E.2d 354, 361 (2008) (quoting *State v. Jarrell*, 350 S.C. 90, 98, 564 S.E.2d 362, 367 (Ct.App.2002)).

We conclude Eccles's testimony regarding Holder is not inadmissible character evidence. Rather, the coworker was merely recounting her version of events leading up to the time Holder's child was killed, as well as her impression of Holder during this time frame. The State's purpose for offering the testimony was not to show Holder had a propensity to abuse her child in conformance with a character trait. Rather, it was to show Holder's strong desire to please Martucci instead of protecting the welfare of her child and to establish an element of the offense, that she manifested an extreme indifference to the well-being of her son.

Moreover, the impact of this brief evidence was minimal in light of the record as a whole, and it was cumulative to other evidence along these same lines that was admitted without objection. *See, e.g., State v. Brown*, 344 S.C. 70, 75, 543 S.E.2d 552, 554–55 (2001) (holding the erroneous admission of evidence is harmless beyond a reasonable doubt where it is minimal in the context of the entire record and cumulative to other testimony admitted without objection).

## (C) Autopsy Photographs

▉▉ Holder next argues the trial court committed reversible error in admitting autopsy photographs, especially those showing Bo's internal injuries, into evidence.

▉▉▉ "The relevancy, materiality, and admissibility of photographs as evidence are matters left to the sound discretion of the trial court." *State v. Nance,* 320 S.C. 501, 508, 466 S.E.2d 349, 353 (1996). "If the offered photograph serves to corroborate testimony, it is not an abuse of discretion to admit it." *Id.*

▉▉ "To constitute unfair prejudice, the photographs must create 'an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Jackson,* 364 S.C. 329, 334, 613 S.E.2d 374, 376 (2005) (quoting *State v. Alexander,* 303 S.C. 377, 382, 401 S.E.2d 146, 149 (1991)).

In the current appeal, the pathologist, Dr. Michael Eugene Ward, testified, in camera, that the photographs would help him in "demonstrating the anatomic relationships and the disruption of those anatomic relationships. There may be some lack of knowledge of internal anatomy [among the jurors]." Dr. Ward stated he could explain the injuries to the jury without the photographs, but he was not sure if he could "explain it to their understanding." He also noted that this "would be the best way by not only demonstrating the anatomic relationships, but also showing the injuries."

During his testimony, Dr. Ward explained that some of Bo's internal injuries showed signs of trying to heal, so they had been inflicted more than a day before his death. Dr. Ward stated Bo also had external bruising on his abdomen that was probably inflicted closer to the time of his death. The pathologist also indicated blunt trauma force was used and noted the extensive bruising over the child's body. Dr. Ward used the photographs to explain the evidence and the reasons for his findings.

We find the photographs clearly demonstrate the extent and nature of the injuries in a way that would not be as easily understood based on the testimony alone. The photographs corroborated the pathologist's testimony about the extensive

bruising on the child, which was in various stages of healing, and showed that even internal organs manifest signs of bruising. This is particularly helpful to jurors who are unversed in medical matters. Although Holder testified she was unaware of any marks on her son prior to his death and thought he was suffering from simple food poisoning, it is abundantly clear from the extensive bruising on the child, which was in various stages of healing, and the torn internal organs, that he had been seriously injured. These photographs demonstrate that the damage to the child would have been difficult to ignore.

Although the photographs were graphic, the facts in this case were graphic, and there is no suggestion that their admission had an undue tendency to suggest a decision on an improper basis. We hold the trial court properly exercised its discretion in admitting the autopsy photographs in this case. *See, e.g., State v. Ward,* 374 S.C. 606, 613, 649 S.E.2d 145, 149 (Ct.App.2007) (holding the trial court did not abuse its discretion in allowing two autopsy photographs to illustrate a graze wound on the murder victim's back as the jury's understanding of the graze wound was necessary to rebut the defense's argument about the angle of the shot); *State v. Jarrell,* 350 S.C. 90, 106–07, 564 S.E.2d 362, 371 (Ct.App.2002) (finding the trial court properly admitted several autopsy photographs in a case of homicide by child abuse because they were necessary for the jury to comprehend the pathologist's testimony regarding the extent of the baby's injuries and the nature of the abuse; the court noted that, "while some of 'the photograph[s] are graphic, the facts of the case are very graphic' and the photos helped the jury understand the pathologist's testimony" (alteration in original)).

### (D) Photographs Showing Prior Abuse of the Victim

Holder lastly argues the trial court erred in admitting State's Exhibits 16 and 17, photographs taken of her son approximately a month before his death, because they were intended to imply her son had previously been abused. Holder contends the photographs were inadmissible evidence of prior bad acts and the State failed to prove the prior abuse by clear and convincing evidence. Holder asserts the photographs "show minor injuries at best [even] if they were intentionally inflicted."

State's Exhibit 16 shows a woman kneeling next to Bo, whose back is facing the camera. The woman has pulled Bo's T-shirt up to reveal faint bruising on his back. In State's Exhibit 17, the same woman is holding Bo's right arm straight out with the inside of the arm facing up. A small, triangular mark resembling a burn is visible just below the child's elbow. Both photographs bear the date June 20, 2002.

Elizabeth Jane Venesky testified that she lived next door to Martucci, Holder, and Bo, and that she is the woman who appears in the two photographs. She said the photographs were taken by her husband, Ronald Venesky, on or about June 20, 2002, and Holder was present. Venesky stated when Holder came over that day with Bo, she noticed Bo had a bruise on his shoulder, a burn mark, and "a busted lip." Venesky's son, who played with Bo, mentioned seeing bruises on Bo, so Venesky decided to have some photographs taken because she thought "something is not right [with] this." Venesky explained, "And so that's how we came to take the pictures. Because I thought, well, if something happens or we see he's being abused, at least, we'll have some kind of pictures."

Venesky further testified that, around the same time the photographs were taken, Holder and Bo spent the night with her after Holder told her Martucci had kicked them out. The next day, Venesky arranged for her step-cousin to take care of Bo for a day after Holder told her she needed someone to keep him and did not want to contact her parents.

Venesky stated Holder thereafter called her and was angry that photographs had been taken of her son. Venesky reminded Holder that she had been present when the photographs were made. Venesky recalled that Holder stated at one point during their conversation that "she was just mad, that she smacked Bo in the mouth when he back-talked her."

Robin Center, Venesky's step-cousin, testified that when Holder left Bo with her, she noticed Bo had a triangular burn mark, which looked like it was caused by the end of an iron, as well as a swollen, lacerated lip. Bo also had a large black bruise on the back of his neck, as well as "purplish-looking" bruises on the small of his back and some additional, lighter

bruising. Center stated "there's just so much that I s[aw] on him" and it was "really shocking."

"The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *Id.*

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 404(b), SCRE. "It may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent." *Id.* Evidence of prior bad acts that are not the subject of a conviction must be establishing by clear and convincing evidence. *State v. Smith*, 300 S.C. 216, 218, 387 S.E.2d 245, 246–47 (1989). "The evidence admitted 'must logically relate to the crime with which the defendant has been charged.'" *State v. Stokes*, 381 S.C. 390, 404, 673 S.E.2d 434, 441 (2009) (quoting *State v. Beck*, 342 S.C. 129, 135, 536 S.E.2d 679, 682–83 (2000)).

The probative value of the evidence must outweigh the danger of unfair prejudice. Rule 403, SCRE. The determination of the prejudicial effect of the challenged evidence must be based on the entire record, and the result will generally turn on the facts of each case. *State v. Gillian*, 373 S.C. 601, 609, 646 S.E.2d 872, 876 (2007).

"A person is guilty of homicide by child abuse if the person ... causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life." S.C.Code Ann. § 16–3–85(A)(1) (2003).

For purposes of the homicide by child abuse statute, "child abuse or neglect" is defined as "an act or omission by any person which causes harm to the child's physical health or welfare." *Id.* § 16–3–85(B)(1). The statute defines "harm" as occurring when a person "inflicts or *allows to be inflicted* upon the child physical injury, including injuries sustained as a result of excessive corporal punishment." *Id.* § 16–3–85(B)(2)(a) (emphasis added).

"Extreme indifference" as used in the statute has been defined as "a mental state akin to intent characterized by a deliberate act culminating in death." *McKnight v. State*, 378 S.C. 33, 48, 661 S.E.2d 354, 361 (2008) (quoting *State v. Jarrell*, 350 S.C. 90, 98, 564 S.E.2d 362, 367 (Ct.App.2002)).

"The statute makes clear that child abuse may be committed by either **an act or an omission** which causes harm to a child's physical health." *State v. Smith*, 359 S.C. 481, 492, 597 S.E.2d 888, 894 (Ct.App.2004) (emphasis in original). "Additionally, harm to a child's health occurs when a person either **inflicts, or allows to be inflicted** physical injury upon a child." *Id.* (emphasis in original). In *Smith*, the court concluded there was evidence of homicide by child abuse where, among other things, the medical evidence indicated the injuries to the child were so severe that they were the result of child abuse that would have been readily apparent. *Id.*

We hold the trial court did not abuse its discretion in admitting the photographs in this instance. Under section 16–3–85, the State was required to show Holder manifested an "extreme indifference" to her child's wellbeing. These photographs tend to establish Holder was aware of ongoing abuse of her child, which is directly relevant to whether her acts *or omissions* resulted in the death of Bo. They are thus relevant to establish elements of the offense, including "extreme indifference."

Further, the photographs established a pattern of continuous abuse and neglect, which made it more probable that Bo was a victim of child abuse or neglect rather than a mere accident. The State's primary theory in this case was that Holder had allowed Martucci to abuse Bo in the months prior to his death. Holder's culpability for homicide by child abuse arose from her complicity in the abuse, which culminated in the death of Bo on July 17, 2002 from severe internal injuries that had been inflicted in the day or days prior to his death.

The injuries to Bo at the time these photographs were taken, including the bruising on his back and the mark on his arm, were similar to the injuries he had sustained prior to his death, as the pathologist noted extensive bruising on Bo's back and an unusual mark on his arm, among other injuries. Bo also had a lacerated mouth at the time of his death, which is

similar to the split lip the witnesses testified they observed in June 2002. *See, e.g., State v. Gaines,* 380 S.C. 23, 30, 667 S.E.2d 728, 731 (2008) ("Where there is a close degree of similarity between the crime charged and the prior bad act, both this Court and the Court of Appeals have held prior bad acts are admissible to demonstrate a common scheme or plan.").

The photographs also corroborated other evidence that was admitted on this point without objection. Venesky and Center both testified without objection about the injuries they observed on Bo, including the bruising on his back and the burn mark, and Holder admitted that she had hit her son in the face. Thus, we find there was clear and convincing evidence of prior abuse of Bo and conclude the photographs were properly admitted by the trial court.

## III.  CONCLUSION

Based on the foregoing, the conviction and sentence of Holder are

**AFFIRMED.**

TOAL, C.J., WALLER, PLEICONES and KITTREDGE, JJ., concur.