# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Carmie Josette Nelson, Petitioner.

Appellate Case No. 2021-001356

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

Appeal from Charleston County
J. C. Nicholson Jr., Circuit Court Judge

Opinion No. 28171
Heard May 17, 2023 – Filed August 9, 2023

## REVERSED

Appellate Defender Sarah Elizabeth Shipe, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Assistant Attorney General Tommy Evans Jr., of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, all for Respondent.

**ACTING JUSTICE HEARN:** The sole issue in this case is the admissibility of autopsy photos. A jury found Petitioner Carmie Nelson ("Carmie") guilty of murdering her roommate, and the trial court sentenced her to life imprisonment. Carmie appealed, arguing, *inter alia*, that the trial court erred in admitting gruesome autopsy photos in contravention of Rule 403, SCRE. The court of appeals, finding no error, affirmed in an unpublished opinion. *State v. Nelson*, Op. No. 2021-UP-330 (S.C. Ct. App. filed Sept. 15, 2021). This Court granted Carmie's petition for a writ of certiorari, and we now reverse. The photos admitted here surpassed "the outer limits of what our law permits a jury to consider." *State v. Torres*, 390 S.C. 618, 624, 703 S.E.2d 226, 229 (2010).

## FACTUAL BACKGROUND

Carmie, a former Army nurse, married Daniel Nelson, also a former Army member, in 2001. The two often lived separately due to Carmie's work as a traveling nurse, and when they did reside together, their relationship was somewhat tumultuous. In 2015, while the Nelsons were living in Charleston, Daniel was convicted of criminal domestic violence (CDV) for attacking Carmie with a knife. Daniel received probation, and the two continued to live together at various hotels and a friend's home in Alabama. They returned to Charleston in 2016 but then separated, with Carmie living at a hotel and Daniel at a homeless camp on Rivers Avenue. Nevertheless, they still maintained a relationship, and Carmie used Daniel's Veterans Administration benefits to pay for her hotel.

In January of 2017, Daniel was arrested for CDV against Carmie. While he was in jail, Carmie was kicked out of her hotel because Daniel stopped making the payments. Carmie, who suffered from addiction, then entered Palmetto Behavioral Health ("Palmetto"), a detox facility. It was at Palmetto where Carmie met Jordan Lum ("Victim"). Subsequently, Victim invited Carmie and her pets to move in with her in Summerville and live there rent-free.

Although Carmie and Victim had originally "hit it off," Carmie soon became tired of Victim and began disparaging her in texts to Daniel, referring to her as a "psychotic bitch." According to Daniel, who testified at trial, Carmie wanted him to assault Victim and suggested they take Victim's designer clothes, sell them, and split the money. The relationship between Carmie and Victim continued to deteriorate, and on the morning of April 2, 2017, the date of Victim's murder, Daniel retrieved Carmie's truck from her previous hotel, intending to go to Victim's house. However, high on meth, crack, and alcohol, he crashed the truck on the way.

Daniel and Carmie gave markedly different accounts of what transpired next. Daniel claimed that after his wreck, during one of several phone calls with Carmie, she asked him to come to Victim's home because she had just killed her and needed his help cleaning up the scene. Daniel explained he went, not only because he wanted to help her, but also because Carmie said she would drop the January 2017 CDV charge against him and offered him "pills, alcohol, and sex." He testified Carmie told him she hit Victim over the head with a hammer while Victim was sleeping on the couch and then stabbed Victim in the neck and body because Victim was still moving. He stated Carmie claimed she killed Victim because Victim was holding her hostage and hitting Carmie's dog. Daniel noted that over the next several days, he and Carmie cleaned up the house, drank, took pills, and discussed what to do with Victim's body, which had been placed in a crate in the garage.

Two days after Victim's death, Carmie drove the Victim's car to Harris Teeter and a liquor store to buy more cleaning supplies, beer, and liquor. According to Daniel, when she returned, things "went downhill quick." Because he and Carmie were frequently fighting, he decided to record their conversations on his phone to protect himself from being blamed for the murder. He surreptitiously recorded two conversations—the first was of Carmie talking about how he had wrecked her truck, and in the second, Carmie admitted to murdering Victim. Daniel testified that after he made the recordings, he packed up his things, left the house, and called 911 to report the murder.

Carmie relayed a different version of events. She testified that when Daniel arrived at Victim's home, she went to take a shower to prepare to go out with Victim, having canceled her date with Daniel because he had wrecked her truck. Carmie stated she heard Victim screaming while she was in the shower, but she did not think anything of it because Victim often yelled at her cat or the neighbors. According to Carmie, when she left the bathroom, Victim was dead. Carmie claimed Daniel took her cell phone, disconnected the landlines, and held her hostage in Victim's house for multiple days by threatening her pets. She admitted going to Harris Teeter and a liquor store on April 4th, but claimed she did so at Daniel's request and because of his threat to harm her and her pets if she called the police. She also claimed Daniel forced her to make the cell phone recordings, threatening to harm one of the dogs if she refused.

After Daniel called 911 and directed the police to Victim's home, police kicked open the door and placed Carmie in custody. The police found Victim's body in the crate in the garage as well as the murder weapon, a hammer. Carmie was arrested and subsequently indicted for murder.

At Carmie's trial, the only contested issue was who had murdered Victim—Carmie or Daniel.  During Carmie's counsel's opening statement, he stated:

> We agree that the victim . . . was brutally murdered.  We agree that she had at least 90 wounds to her body.  We agree with the prosecutor about her cause of death.  We agree about where she was killed.  We agree in general what the murder weapon was, and we agree that on April 4, 2017, Daniel Nelson called police and reported a murder. . . . We disagree about one thing:  Who killed her.

In addition to his version of the Victim's murder, Daniel testified that prior thereto, Carmie had asked him to harass and assault Victim, even going so far as to start planning Victim's murder.  According to Daniel, he never agreed to help Carmie kill Victim, but he admitted she might have believed he had agreed to do so.  Daniel also admitted he had been charged with accessory after the fact of murder for his involvement in this case, and he had charges pending for the January 2017 CDV against Carmie, the unlawful use of 911, and filing a false report of a felony nature.  He further conceded he had provided law enforcement with multiple versions of his involvement in Victim's murder in an attempt to try to make himself look less culpable, including telling 911 and the police that he did not know Carmie had killed Victim when she asked him to come help her clean the house and saying he did not know what he was cleaning up when he knew it was blood.

The State also called the medical examiner who performed the autopsy on Victim, Dr. Nicholas Batalis.  First, without the jury present, the State proffered Dr. Batalis's testimony regarding three of the State's exhibits, which were photos taken during Victim's autopsy.  State's exhibits 75 and 76 are close-up photos of Victim's gruesome head and neck wounds, and they show partial decomposition of Victim's body.  State's exhibit 77 depicts the victim lying on her stomach, showing stab wounds on her back and her swollen head, but it does not display the partial decomposition of Victim or her more gruesome wounds.

Dr. Batalis testified the photos showed fatal, blunt force wounds on the Victim's head, where the "skull had been shattered away" and "[y]ou can actually see down to the brain there," which were consistent with the Victim being hit with a hammer.  He also stated the photos showed several sharp force wounds on Victim's neck, namely that her throat had been cut.  He noted the photos showed some "green discoloration" on Victim's head where Victim was decomposing.  Dr. Batalis admitted he had a diagram of Victim's injuries which he made during her autopsy,

and that he could testify and describe the wounds without the autopsy photos, but "the picture does a much better job of showing the feature, where the diagram is just an estimation." He stated his testimony as to his findings would remain the same with or without the pictures.

Carmie objected to the admission of autopsy photos, noting they were gruesome and would "inflame the passions of the jury," and that Batalis could testify using the diagram instead of the photos. The State asserted the photos were probative as to Victim's cause of death, would aid Dr. Batalis in describing the injuries to the jury, and were probative of malice. The trial court admitted the autopsy photos, "based on the doctor's testimony and the fact that he says it would help him show the jury the cause of death. . . . I think it does have some probative value. Probative value outweighs prejudicial value under 403."

Dr. Batalis then testified as an expert witness in front of the jury, and the State introduced the three autopsy photos into evidence over Carmie's renewed objections. Dr. Batalis testified Victim died on either April 2 or April 3, 2017, and she had 113 wounds to her head, neck, chest, and upper extremities. Dr. Batalis testified the blunt force trauma wounds to Victim's head were consistent with the Victim being struck by a hammer and were fatal, as was the sharp force injury to Victim's neck. He also explained Victim had nineteen stab wounds to her chest, which were consistent with being stabbed with a knife. Dr. Batalis opined Victim's cause of death was a combination of blunt force and sharp force wounds to her head, neck, and chest. Consequently, the jury heard a technical medical description. With or without the photos, Dr. Batalis nevertheless testified as to the gruesome nature of Victim's wounds. Thereafter, the jury convicted Carmie, and she was sentenced to life imprisonment.[1]

## DISCUSSION

The sole issue before us is whether the court of appeals erred in affirming the admission of the autopsy photos over Carmie's Rule 403, SCRE, objection. Carmie sets forth several reasons why it was error to admit the autopsy photos, but the one we find most compelling is that the photos had little probative value as to any disputed fact in this case. Beginning with the opening statements at trial, it was clear that the only issue for the jury to decide was who killed Victim—Carmie or Daniel—

---

[1] Daniel was indicted for accessory after the fact of murder, pled guilty, and received a five-year sentence.

and that did not change throughout the trial.  As we will discuss, the State always must prove its case beyond a reasonable doubt; however, the photos here provided little probative value as to any element of murder.  Therefore, we hold it was error to admit the photos because their minimal probative value was substantially outweighed by the danger of unfair prejudice.

We begin our analysis by recognizing that the admission of evidence is addressed to the sound discretion of the trial court, and its ruling will not be disturbed in the absence of an abuse of discretion accompanied by prejudice.  *State v. Wise*, 359 S.C. 14, 21, 596 S.E.2d 475, 478 (2004).  Under Rule 403, SCRE, relevant evidence may be excluded where its probative value is substantially outweighed by the danger of unfair prejudice.  Moreover, "[I]t is well-established that photographs calculated to arouse the sympathies and prejudices of the jury are to be excluded if they are irrelevant or unnecessary to the issues at trial."  *State v. Jones*, Op. No. 28145 (S.C. filed Mar. 29, 2023) (Howard Adv. Sh. No. 12 at 23, 54) (quoting *State v. Middleton*, 288 S.C. 21, 24, 339 S.E.2d 692, 693 (1986)).

Much of our case law surrounding the admission of gruesome autopsy photos and Rule 403, SCRE, arises in the context of the sentencing phase of a capital murder trial, where the scope of the probative value of such photos is necessarily broader.  *State v. Kornahrens*, 290 S.C. 281, 289, 350 S.E.2d 180, 186 (1986) ("The trial judge is still required to balance the prejudicial effect of the photographs against their probative value.  However, in the sentencing phase, the scope of the probative value is much broader.").  By contrast, "[i]n the *guilt* phase of a trial, photographs of the murder victims should be excluded where the facts they are intended to show have been fully established by competent testimony."  *Id.* at 288–89, 350 S.E.2d at 185.  Thus, while photographs may be inadmissible in the guilt phase of a trial, they are likely to be "relevant in the sentencing phase to show the circumstances of the crime and the character of the defendant."  *Id.* at 289, 350 S.E.2d at 186; *see State v. Rosemond*, 335 S.C. 593, 597, 518 S.E.2d 588, 590 (1999) ("Photographs of a victim's body are admissible in the sentencing phase of a death penalty trial to show the circumstances of the crime and the character of the defendant.").

In *Kornahrens*, this Court found the trial court did not err in admitting autopsy photos during the sentencing phase of a capital murder trial because, "[They] showed what the defendant himself did to the bodies and nothing more.  The appearance of the bodies as the defendant left them has not been altered by decomposition or by any other outside force."  290 S.C. at 288–89, 350 S.E.2d at 185–86.  This court noted the autopsy photos "most likely would have been inadmissible in the guilt phase," but under the circumstances of the case, "they were relevant in the sentencing

phase to show the circumstances of the crime and the character of the defendant." *Id.* at 289, 350 S.E.2d at 186.

In *Middleton*, this Court concluded autopsy photographs showing a victim's scalp pulled away from her skull and the victim's vaginal cavity containing semen should have been excluded.[2] 288 S.C. at 24, 339 S.E.2d at 693. In reaching this finding, this Court noted the appellant offered to stipulate to the facts shown in the photos, but the State refused to accept the stipulation. *Id.* On appeal, the State argued the photos were properly admitted to corroborate forensic testimony, demonstrate the violent nature of the murders in this case, and to corroborate the appellant's statements, but the appellant argued the photographs did not contain disputed information and this information could have been proven by other evidence. *Id.* The State admitted the photos "were not essential to the prosecution." *Id.* In reversing, this Court noted appellant's offer to stipulate to the facts in the photos, that the information in the photos were not in dispute, and that the forensic pathologist's testimony "negated any arguable evidentiary value of the photographs." *Id.* Thus, this Court held, "[t]he prejudice created by the photographs clearly outweighed *any* evidentiary value." *Id.*

In *Torres*, this Court affirmed the trial court's decision to admit autopsy photos during the sentencing phase of a capital murder trial, noting the photos showed what the defendant did to the victim and went "straight to circumstances of the crime." 390 S.C. at 623–24, 703 S.E.2d at 229. This Court noted that while the photos were not "easy to view," the doctor who performed the victim's autopsy used the photos, including close-up photos of the victim's wounds, to "illustrate the number of injuries, location of the injuries, and manner in which the injuries were committed" and "to help identify the nature of each particular injury." *Id.* at 624, 703 S.E.2d at 229. Importantly, we took the opportunity to address "an area of growing concern to this Court," stating:

> The photographs at issue in this case, while admissible, are at the outer limits of what our law permits a jury to consider. . . . *Today we strongly encourage all solicitors to refrain from pushing the envelope on admissibility in order to gain a victory which, in all likelihood, was already assured.*

---

[2] While *Middleton* was a capital murder case, it is unclear whether the autopsy photos were offered during the guilt phase or the sentencing phase of the trial.

*Id.* at 624, 703 S.E.2d at 229 (emphasis added).

This Court recently considered the admissibility of gruesome autopsy photos during the sentencing phase of a capital murder trial in *Jones*. Op. No. 28145, at 53-59. In *Jones*, we held the trial court erred in admitting autopsy photos of the bodies of the defendant's children during the sentencing phase of the trial, noting the autopsy photos had no probative value because they did not depict (1) the children's bodies in the same condition Jones left them in due to severe decomposition and (2) strangulation or ligature marks on the children and, as such, did not corroborate the testimony of the medical examiner. *Id.* at 57. We concluded that, even if the photos had probative value to show Jones's character and how Jones had disposed of his children's bodies, under Rule 403, SCRE, this probative value was substantially outweighed by the dangers of unfair prejudice. However, in *Jones*, the admission of the "horrific" photos was harmless because they did not contribute to the jury's decision to sentence Jones to death; instead, the admittedly horrific facts of the case did. *Id.* at 58–59.

The admission of autopsy photographs has also been discussed in non-capital murder trials. In *State v. Holder*, the defendant alleged the trial court erred in admitting autopsy photographs in a homicide by child abuse case despite the testimony of the doctor who performed the autopsy that while he could explain the victim's internal injuries to the jury without the photos, "he was not sure if he could explain it to their understanding" without the photos. 382 S.C. 278, 290, 676 S.E.2d 690, 697 (2009). This Court affirmed the admission of the photos, noting they demonstrated the victim's injuries in a way the jury, which may have been unversed in medical issues, could easily understand. *Id.* at 290–91, 676 S.E.2d at 697. This Court also noted while the photos were graphic, "there is no suggestion their admission had an undue tendency to suggest a decision on an improper basis." *Id.* at 291, 676 S.E.2d at 697; *but see State v. Haselden*, 353 S.C. 190, 577 S.E.2d 445 (2003) (holding, based on Rule 403, SCRE, the admission of a photo of the victim's dilated anus during autopsy was error because it "did not go to the circumstances of the crime, the characteristics of the defendant, nor to the existence of aggravating circumstances . . . [t]he sole purpose of the photo was to insinuate that perhaps there was sexual abuse when, in fact, there was absolutely no evidence of such an assault").

In *State v. Collins*, a defendant was tried for several crimes, including involuntary manslaughter, related to his unrestrained dogs mauling a ten-year-old child to death. 409 S.C. 524, 531–34, 763 S.E.2d 22, 26–28 (2014). The trial court allowed the admission of seven autopsy photos taken by the forensic pathologist. *Id.*

at 532–33, 763 S.E.2d at 27. In *Collins*, the "nature and extent" of the victim's injuries was disputed by the defendant, and the photos, while gruesome, clearly showed the Victim's injuries. *Id.* at 532-33, 533 n.3, 763 S.E.2d at 27 n.3. Thus, this Court stated the photos should not be excluded on the ground they were gruesome when the photos were "highly probative, corroborative, and material in establishing the elements of the offenses charged; its probative value outweighed its potential prejudice; and the [court of appeals] should not have invaded the trial court's discretion in admitting this crucial evidence based on its emotional reaction to the subject matter presented." *Id.* at 535–36, 763 S.E.2d at 28. Yet, a majority of this Court in *Collins* reasoned the admission of the photos was error, although two of us concluded the error was harmless. *Id.* at 539–40, 763 S.E.2d at 30–31. Nevertheless, we noted "this case was tried in 2009, prior to our decision in *Torres,* where we expressed our concern over the State's seeming practice of seeking admission of highly prejudicial and inflammatory autopsy photographs." *Id.* at 539, 763 S.E.2d at 30 (Kittredge, J., concurring).

This case does not involve the admission of evidence during the sentencing phase of a capital murder trial; therefore, the trial court did not have broader discretion to allow evidence that would generally be inadmissible during the guilt phase of a trial. Our review of the jurisprudence in this area persuades us that this case follows those cases in which autopsy photos were admitted in error. This case is most similar to *Middleton*, wherein this Court noted the autopsy photographs in question had little, if any, evidentiary value because the information depicted in the photos was not in dispute and the scant evidentiary value they did contain was negated by the forensic examiner's testimony. 288 S.C. at 24, 339 S.E.2d at 693.

First, much like in *Middleton*, the information gained from the autopsy photos was not in question. Here, the only issue was who murdered Victim: Carmie or Daniel. Carmie raised no argument that Victim was not murdered, no argument that Victim was not murdered in the way the State claimed–namely, being beaten in the head with a hammer, having her throat slit, and receiving several stab wounds to her chest—and no argument that Victim did not have around 100 wounds on her body. Notably, Carmie did not even cross-examine Dr. Batalis, who performed the autopsy.

Second, as in *Middleton*, we believe the undisputed facts evidenced by the autopsy photos–the location, number, and type of wounds suffered by Victim and the inference of malice raised therefrom–could have been and were established by other convincing evidence. *See Kornahrens*, 290 S.C. at 288–89, 350 S.E.2d at 185 ("In the *guilt* phase of a trial, photographs of the murder victims should be excluded

where the facts they are intended to show have been fully established by competent testimony."). We agree with the State that even though these facts were undisputed, the State still had to prove how Victim was murdered and that Victim was murdered with malice. *See* S.C. Code Ann. § 16-3-10 (2023) (providing murder is "the killing of any person with malice aforethought, either express or implied").

However, we believe Dr. Batalis's testimony regarding the extent of Victim's injuries and Victim's cause of death established both how Victim was killed and that Victim was killed with malice. *See State v. Kelsey*, 331 S.C. 50, 62, 502 S.E.2d 63, 69 (1998) ("'Malice' is the wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong."). Dr. Batalis testified Victim had 113 wounds to her head, neck, chest, and upper extremities, including fatal blunt force trauma wounds to the head consistent with the Victim being struck by a hammer, a fatal sharp force injury to Victim's neck, and nineteen stab wounds to her chest consistent with being stabbed with a knife. Dr. Batalis opined Victim's cause of death was a combination of the blunt force and sharp force wounds to her head, neck, and chest. Dr. Batalis also stated he had a diagram he could use to show the jury the approximate locations and type of wounds suffered by the Victim, and his testimony as to Victim's cause of death would not change based on his ability to use the autopsy photos.[3] Thus, we believe Dr. Batalis's testimony as to Victim's 113 injuries could have properly established how Victim was killed and that Victim was killed with malice, negating the evidentiary value to be gained from the autopsy photos just as in *Middleton*. We note the State also established malice by introducing (1) Carmie's disparaging texts about Victim in the days preceding Victim's murder; (2) Daniel's testimony that Carmie had asked him to harass and assault Victim, and that Carmie had been planning to murder Victim; and (3) the recorded statement of Carmie saying she attacked Victim while she was on the couch and kept beating her after she fell to the ground.

---

[3] We acknowledge Dr. Batalis testified he believed the autopsy photos would better help the jury understand Victim's injuries than just his testimony and diagram similar to the medical examiner in *Holder*. 382 S.C. at 290–91, 676 S.E.2d at 697. However, we believe this case is distinguishable from *Holder* because, unlike the injuries in *Holder* which required the jury to understand the internal injuries suffered by the victim, 382 S.C. at 290–91, 676 S.E.2d at 697, we believe an average juror could understand just from Dr. Batalis's testimony that Victim died as a result of being bludgeoned in the head with a hammer, having her throat cut, and being stabbed multiple times in the chest.

In response to the State's argument the autopsy photos corroborated Daniel's testimony and therefore aided the jury in deciding whether he or Carmie was telling the truth about who murdered Victim, we note these photos provide no insight as to who killed Victim. Thus, we do not believe the autopsy photos corroborate Daniel's testimony that Carmie killed Victim. Under a Rule 403, SCRE, analysis, the photos had limited probative value. In this instance, where the photos were not needed to prove an issue in the case, the State should have heeded our warning in *Torres* to resist pushing the envelope on admissibility to gain a victory which was likely already assured.

The admission of these excessively gruesome autopsy photos unnecessarily created the potential for the jury to convict Carmie of the murder based on inflamed emotions in a case where the jury was provided with undisputed evidence as to how Victim died, as well as ample evidence that she had been killed with malice, whether by Carmie or Daniel. *See Jones*, Op. No. 28145, at 23, 54 ("[I]t is well-established that photographs calculated to arouse the sympathies and prejudices of the jury are to be excluded if they are irrelevant or unnecessary to the issues at trial." (quoting *Middleton*, 288 S.C. at 24, 339 S.E.2d at 693)). The potential for a verdict based on emotion was amplified by the fact the jury was informed that Daniel had also been charged in connection with this case but only faced an accessory after the fact of murder charge.

If this were a case such as *Collins* where the nature of the victim's injuries was in dispute or a case where there was no other convincing evidence of malice or the manner in which the victim died, then the photos may have had sufficient probative value to warrant their admission. In that scenario, while undeniably gruesome, the probative value of the photos may not have been substantially outweighed by the danger of unfair prejudice under Rule 403, SCRE. Nevertheless, here, there was minimal probative value in the photos because the issues of malice and how Victim was killed were not in dispute. Other convincing evidence established malice and how Victim was killed, thereby eliminating the photos' probative value. Thus, we believe the danger of unfair prejudice substantially outweighed any minimal probative value of the autopsy photos in this case. *See* Rule 403, SCRE. Accordingly, we believe the trial court erred in admitting the photos, and the court of appeals erred in affirming that decision.

**REVERSED.**

**KITTREDGE, Acting Chief Justice, FEW, HILL, JJ., and Acting Justice Jean H. Toal, concur.**