765 S.E.2d 841

**The STATE, Respondent,**

v.

**Daniel D'Angelo JACKSON, Appellant.**

**Appellate Case No. 2011–199366.**

**Nos. 2011–199366, 5278.**

Court of Appeals of South Carolina.

Heard June 10, 2014.

Decided Nov. 5, 2014.

Rehearing Denied Dec. 17, 2014.

Dayne C. Phillips, of Lexington, and Appellate Defender Carmen Vaughn Ganjehsani, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, and Senior Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia; and Solicitor Ernest Adolphus Finney, III, of Sumter, for Respondent.

FEW, C.J.

Daniel D'Angelo Jackson appeals his convictions for murder and armed robbery. He argues he was denied his Sixth Amendment right of confrontation when the trial court admitted the redacted statements of his nontestifying codefendant Reginald Canty. We reverse.

## I. Facts and Procedural History

On the night of January 12, 2008, William Flexon was shot twice and killed while delivering pizzas to lot seven in O.C. Mobile Home Park in the Cherryvale area of Sumter. Law enforcement officers found Canty walking nearby shortly after the shooting. Canty agreed to speak with the officers, and between January 13 and 25, he gave six statements.

In his statements, Canty described his and Jackson's role in the events leading up to Flexon's death.[1] Canty stated he was at home in O.C. Mobile Home Park when Jackson asked him if he wanted to make some money by robbing a pizza delivery man. Canty wrote, "I said yes cause I didn't want the other guys to laugh and pick at me."[2] At Jackson's request, Canty's cousin Desmond took Jackson and Canty to Cherryvale Grocery. Canty saw Jackson use the pay phone outside the grocery store, and heard him call Sambino's Pizza Restaurant and order three large pizzas, requesting delivery to lot seven in O.C. Mobile Home Park. Canty stated he and Jackson then went inside the store, where Jackson purchased "a Debbie snack cake (donut sticks)." Canty and Jackson returned to the mobile home park and waited for the pizza delivery man to arrive. Canty reported he stayed at his house

---

1. We have included an appendix that contains Canty's fifth statement as read to the jury. However, several details in this paragraph are from Canty's other statements.

2. Canty was sixteen years old at the time of the crimes, and Jackson was nineteen.

where he could see lot seven while Jackson hid behind some trailers. Canty watched the pizza delivery man arrive at lot seven, and saw him exit his vehicle. Canty stated the delivery man "went to the abandoned residence (Lt.7) and saw the door open and then turn[ed] around [and] went back to his vehicle real fast." Canty then saw Jackson and at least one other person rob the delivery man. Canty reported Jackson shot the delivery man and ran away.

The State charged Jackson and Canty with murder and armed robbery and called them to trial together. Jackson filed a pretrial motion to sever the trials, arguing that if the State introduced Canty's statements at trial and Canty did not testify, the admission of the statements would violate Jackson's constitutional right to confront and cross-examine Canty. *See Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476, 479 (1968) (holding the Confrontation Clause of the Sixth Amendment bars the admission of a nontestifying codefendant's confession that incriminates another defendant). The trial court denied the motion. Jackson renewed his severance motion on the first day of trial. As an alternative to severance, Jackson requested the court "thoroughly redact[ ]" the statements, but argued, "I don't think that's going to protect us." The court denied Jackson's renewed severance motion and stated, "[W]e'll see where we are on redaction if any statements are proposed by the State."

The State presented testimony and evidence establishing that Jackson and Canty acted together to lure a pizza delivery man to a vacant trailer at O.C. Mobile Home Park and rob him there. The owner of Sambino's Pizza Restaurant testified that on the night of January 12, a man called and ordered three large pizzas. The unnamed man told her he was calling from a pay phone, and he requested the pizzas be delivered to lot number seven in O.C. Mobile Home Park. A custodian of telephone records subsequently testified the call to Sambino's was made from the pay phone at Cherryvale Grocery.

Eugene Mackovitch testified he was working at Cherryvale Grocery the night of January 12. He recalled two African-American men—one darker-skinned and the other fairer-skinned—entered the store together, and he sold one of them a Little Debbie snack cake. During his testimony, the State

played surveillance video showing Mackovitch and the two men inside the grocery store.[3] Mackovitch explained the video showed him selling the Little Debbie snack cake to one of the men.

The State presented two witnesses who identified by name the two men shown in the video. Anitta Shannon, another employee of the grocery store, testified she personally knew Jackson and identified him as the individual buying the Little Debbie snack cake. Sergeant Robert Burnish of the Sumter County Sheriff's Office—the chief investigating officer on the case—identified both Jackson and Canty as the men in the video.

Later, the State sought to introduce Canty's statements. Jackson requested the trial court review the third, fourth, fifth, and sixth statements, and the court held a hearing outside the jury's presence. The State proposed to redact the four statements by replacing Jackson's name with "another person," and the court found this redaction satisfied the requirements of *Bruton*. Jackson objected on the basis that admitting the statements violated his right to confront and cross-examine Canty. He argued that even with the State's proposed redaction, the statements were "still going to lead to inferences ... that it might be my client that he's referring to." The court overruled Jackson's objection.

Investigator Dominick West of the Sumter County Sheriff's Office then read the redacted versions of the four statements to the jury. He did not say Jackson's name, but instead said "another person" or "the other person" wherever Jackson's name appeared in the statements. Canty's redacted statements described how "another person" (1) asked Canty if he wanted to participate in robbing a pizza man; (2) told Canty to get Desmond to take them to Cherryvale Grocery; (3) used the pay phone to call Sambino's and order three large pizzas, requesting delivery to lot seven in O.C. Mobile Home Park; (4) bought a "Debbie snack cake donut sticks"; (5) returned to the mobile home park with Canty; (6) went behind the trailer on lot seven and waited for the pizza man to arrive; and (7)

---

3. Cherryvale Grocery had no surveillance cameras outside, where the pay phone was located.

robbed and shot the pizza man, while Canty watched from his house.

Sergeant Burnish testified about his investigation of the crimes and read the original, unredacted versions of Canty's first and second statements to the jury.[4] In the first statement, Canty reported, "The gun looked like a rifle and the person that was holding the gun had a hoodie, but I couldn't see his face." He next read the second statement, in which Canty named "the bad guy ... James or J–Boy" as the person who shot the pizza man with a rifle and ran. Sergeant Burnish also read the same redacted version of the sixth statement that Investigator West read.

After Sergeant Burnish testified that Canty made his third statement on January 15, Sergeant Burnish explained:

Q: You were not there when Mr. Canty gave a statement on the 15th?

A: I was in the building; I was not present for that statement.

Q: Now, what happened and what did you do next in your investigation?

A: Based on the information that was received on that date is when we issued warrants for the arrest of Mr. Jackson.

At the close of the State's case, Jackson moved for a mistrial on the basis that admitting Canty's statements violated his right to confront and cross-examine Canty. The trial court denied Jackson's motion. Neither Canty nor Jackson testified. After Canty and Jackson presented their defenses, Jackson renewed his mistrial motion, which the court again denied.

The State presented no direct evidence of the events that occurred after Canty and Jackson left the grocery store, except Canty's statements. In particular, no eyewitnesses to the shooting testified. However, circumstantial evidence linked Jackson to the crimes. Both Investigator West and Sergeant Burnish testified they interviewed Jackson after his arrest, and Jackson "said how could I be charged with armed robbery if I didn't steal anything from the pizza man." Jack-

---

4. Canty's first and second statements did not name Jackson.

son also admitted he fled his aunt's house when he saw law enforcement officers coming. The State presented an officer who testified he recovered a Little Debbie donut sticks wrapper from "the side of the road near the entrance to ... the mobile home park," 137 feet from Flexon's body. Canty called Latoya Rush, who testified she was Canty's neighbor when the crimes occurred. She recalled asking Canty that evening "to keep an eye on [her] house because [she] didn't want to lock [the] door" while she went to McDonald's. Rush stated that "a little while" before she left to go to McDonald's, Jackson was at her house and asked her if she had "any socks or gloves." Rush testified she went to McDonald's and was gone for "no more than ten minutes," and when she came back, she saw officers had arrived in her neighborhood because a "man was dead."

The State also presented Jackson's aunt, Andrea Russell, who testified Jackson "spent a few days" at her apartment in January 2008, although she could not recall exactly when. She later found underneath her couch a rifle that she remembered Jackson brought with him when he arrived. At trial, she identified it as the rifle the State introduced in evidence. The State's firearms expert, referring to the rifle Russell found in her apartment and a bullet fragment removed from Flexon's body, testified "this gun fired that bullet into William Flexon." The firearms expert also testified a shell casing Russell found in her apartment was fired by the same rifle. The jury found Jackson and Canty guilty of murder and armed robbery. The trial court sentenced Jackson to life in prison for murder and thirty years in prison for armed robbery.[5]

## II. Admission of Canty's Statements Violated the Confrontation Clause

The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to confront and cross-examine the witnesses against him, and the Fourteenth Amendment applies this right

---

5. The trial court sentenced Canty to thirty years in prison for his convictions. This court affirmed Canty's convictions in an unpublished opinion. *State v. Canty*, 2014–UP–208, 2014 WL 2721761 (S.C. Ct.App. filed June 4, 2014).

to the States. U.S. Const. amends. VI and XIV; *State v. Henson,* 407 S.C. 154, 161, 754 S.E.2d 508, 512 (2014). In a joint trial, the admission of a nontestifying codefendant's confession that incriminates another defendant violates the other defendant's right of confrontation. *Bruton,* 391 U.S. at 126, 88 S.Ct. at 1622, 20 L.Ed.2d at 479; *Henson,* 407 S.C. at 161–62, 754 S.E.2d at 512. Such a confession may be admitted in evidence, with an appropriate limiting instruction, only if it is redacted so that it does not incriminate the other defendant on its face, either explicitly or by obvious and immediate implication. *Gray v. Maryland,* 523 U.S. 185, 192, 118 S.Ct. 1151, 1155, 140 L.Ed.2d 294, 301 (1998); *Henson,* 407 S.C. at 161–64, 754 S.E.2d at 512–13; *see also Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176, 188 (1987) (holding a nontestifying codefendant's confession can be admitted only if it "is redacted to eliminate not only the defendant's name, but any reference to his or her existence").

■ Jackson argues the admission of Canty's statements violated his right of confrontation. He contends that even as redacted, the statements allowed the jury to infer that Canty was referring to Jackson. The law requires a court to carefully analyze "the exact words used for redaction . . . in context to determine whether the reference to the defendant was adequately obscured" to avoid a *Bruton* violation. *State v. Holder,* 382 S.C. 278, 285 n. 3, 676 S.E.2d 690, 694 n. 3 (2009); *see id.* (explaining "the use of 'the other guy' ha[s] been upheld as a proper substitution in previous cases," but "there could be some instances where this identical phrase would not be [a] sufficient" redaction (citing *State v. Vincent,* 131 Wash. App. 147, 120 P.3d 120, 123–24 (2005))). As the First Circuit stated,

> The application of *Bruton, Richardson,* and *Gray* to redacted statements that employ phraseology such as "other individuals" or "another person" requires careful attention to . . . the text of the statement itself and to the context in which it is proffered. The mere fact that the other defendants were on trial for the same crimes to which the declarant confessed is insufficient, in and of itself, to render the use of neutral pronouns an impermissible means of redaction. A particular case may involve numerous events and actors, such that no direct inference plausibly can be

made that a neutral phrase like "another person" refers to a specific codefendant. A different case may involve so few defendants that the statement leaves little doubt in the listener's mind about the identity of "another person." In short, each case must be subjected to individualized scrutiny.

*United States v. Vega Molina,* 407 F.3d 511, 520–21 (1st Cir.2005) (internal citations omitted); *see also Richardson,* 481 U.S. at 214, 107 S.Ct. at 1711, 95 L.Ed.2d at 190 (Stevens, J., dissenting) (*"Bruton* has always required trial judges to answer the question whether a particular confession is or is not 'powerfully incriminating' on a case-by-case basis."); *Foxworth v. St. Amand,* 570 F.3d 414, 433 (1st Cir.2009) (stating "an inquiring court must judge the efficacy of redaction on a case-by-case basis, paying careful attention to both a statement's text and the context in which it is offered").

Evaluating the content of Canty's redacted statements in context, we find the admission of the statements violated Jackson's right to confront and cross-examine Canty.

### 1. The Little Debbie Snack Cake

Canty's redacted statements contain one specific detail about the person he referred to as "another person" and "the other person," and because of that detail "the reference to [Jackson] was [not] adequately obscured," *Holder,* 382 S.C. at 285 n. 3, 676 S.E.2d at 694 n. 3, and "the statement [left] little doubt in the listener's mind about the identity of 'another person.'" *Vega Molina,* 407 F.3d at 520. In his fifth statement, Canty stated that while he was inside Cherryvale Grocery, "Another person brought [6] a Debbie snack cake donut sticks." In his third and fourth statements, Canty likewise told officers "the other person brought a snack cake" and "the other person brought a Debbie snack cake." This detail specifically identified Jackson to the jury as "another person"

---

6. Canty wrote the word "brought" in his statements. As the other evidence we discuss in this opinion clearly indicates, however, he meant "bought," as in purchased. In reaching this conclusion, we rely on Investigator West's testimony during a pretrial hearing concerning the voluntariness of Canty's statements: "[Canty] stated that [Jackson] bought Debbie cake, Debbie snack cake and left the store." Investigator West gave similar testimony before the jury.

and "the other person." The State had already shown the store's surveillance video in which jurors could see a man purchase what appeared to be a snack. Mackovitch—the clerk working in the store that night—testified he sold one of the men "a Little Debbie snack cake." Shannon, who was not working that night but who knew Jackson, watched the video and identified Jackson as the person Mackovitch testified purchased the Little Debbie snack cake. This testimony regarding the purchase of the snack cake was a vivid description of a unique act that only one person completed. Thus, when the State presented Canty's fifth statement to the jury in which he stated "another person" bought a Little Debbie snack cake, the conclusion that Canty was referring to Jackson was inescapable on the face of the statement, despite the removal of Jackson's name. When the jury then heard "another person" was one of the men who attacked the pizza man at the mobile home park, the statement obviously and immediately incriminated Jackson.

Moreover, the witnesses testified the video shows one of the men in the store to be a darker-skinned African–American and the other man to be a fairer-skinned African–American. Mackovitch testified "it was the fairer-skin African–American male that purchased the snack cake." While the jury was listening to Canty's statements that "another person brought a Debbie snack cake donut sticks" and "the other person brought a Debbie snack cake," it could see at the defense counsel table Canty and Jackson, the same two people the witnesses had distinguished by the difference in their complexions. In this context, Canty's statements informed the jury that the fairer-skinned man in the video was the same person who (1) asked Canty if he wanted to participate in robbing a pizza man; (2) told Canty to get Desmond to take them to Cherryvale Grocery; (3) used the pay phone at the store to call Sambino's and order three large pizzas, requesting delivery to lot seven in O.C. Mobile Home Park; (4) bought a "Debbie snack cake donut sticks"; (5) returned to the mobile home park with Canty; (6) went behind the trailer on lot seven and waited for the pizza man to arrive; and (7) robbed and shot the pizza man, while Canty watched from his house.

The State argues, however, the statements do not incriminate Jackson on their face. It contends a juror hearing only the statements would not be able to identify Jackson as the person Canty describes, and instead would have to link other evidence—such as the surveillance video and Shannon's testimony—to the statements, and from that linkage draw an inference that "another person" was Jackson. The State maintains this necessity removes Jackson's case from the scope of *Bruton* and subsequent cases. The State's argument is based on passages from the decisions of the Supreme Court of the United States and our supreme court, such as "the rule announced in *Bruton* is a 'narrow' one that applies only when the statement implicates the defendant 'on its face.'" *Holder*, 382 S.C. at 284, 676 S.E.2d at 693 (quoting *Richardson*, 481 U.S. at 207–08, 107 S.Ct. at 1707, 95 L.Ed.2d at 185–86); *see also id.* (stating "[i]n *Richardson*, the Supreme Court remarked that the rule announced in *Bruton* ... does not apply where the statement becomes incriminating only when linked to other evidence introduced at trial, such as the defendant's own testimony"); *Richardson*, 481 U.S. at 208–09, 107 S.Ct. at 1707–08, 95 L.Ed.2d at 186–87 (distinguishing "evidence requiring linkage" from "evidence incriminating on its face" and declining to extend *Bruton* to confessions that incriminate only by inference from other evidence). We find the admission of Canty's statements violated *Bruton* even under the reasoning of *Richardson* and *Holder*.

We agree that because the State redacted Canty's statements to remove Jackson's name, a juror hearing the statements would have to consider evidence outside the four corners of the statements, and draw an inference from the statements in combination with the other evidence that Canty was referring to Jackson. As our supreme court explained in *Henson*, however, "*Richardson* did not turn on whether the confession admitted required an inference in order to incriminate the defendant, but on *the kind of inference required.*" 407 S.C. at 164, 754 S.E.2d at 513 (emphasis added). In *Gray*, the Supreme Court defined the kind of inference required for a *Bruton* violation, holding the admission of a codefendant's statement violates *Bruton* when the "statements ..., despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordi-

narily could make immediately." 523 U.S. at 196, 118 S.Ct. at 1157, 140 L.Ed.2d at 303.

Other courts have applied this standard to determine whether a statement incriminates a codefendant on its face despite the necessity of the jury drawing an inference. *See, e.g., United States v. Green,* 648 F.3d 569, 575 (7th Cir.2011) (citing this passage from *Gray* as the standard courts apply "when the defendant's identity can be established through other evidence" and finding no *Bruton* violation); *In re Terrorist Bombings of U.S. Embassies in E. Afr.,* 552 F.3d 93, 134 (2d Cir.2008) (noting "whether . . . redaction sufficiently protects a criminal defendant's rights 'depend[s] in significant part upon the kind of . . . inference' that the jury may draw," and citing the passage from *Gray* as the standard for determining whether statements "have the effect of 'facially incriminat[ing] the . . . co-defendant,' thereby rendering them unsuitable for admission under *Bruton*" (alteration in original) (quoting *Gray,* 523 U.S. at 196, 118 S.Ct. at 1157, 140 L.Ed.2d at 303)). Our own supreme court quoted the passage from *Gray* in *Henson* before concluding, "In other words, the [*Gray* ] Court brought within *Bruton*'s prohibition those confessions which facially incriminate through inference." 407 S.C. at 164, 754 S.E.2d at 513.

The evidence in this case meets the *Gray* standard for a *Bruton* violation because the statement "obviously refer[red] directly to someone," and the Little Debbie cake reference would cause the jury to immediately infer it was Jackson. *Gray,* 523 U.S. at 196, 118 S.Ct. at 1157, 140 L.Ed.2d at 303. As we previously explained, the State had already conclusively proven—before the jury heard the statements—that Jackson was the person who purchased the Little Debbie snack cake. With this knowledge, the jury could not help but immediately infer from the face of the statements that Jackson was "another person."

The State also argues, however, "The reference to the purchase of a Little Debbie snack cake . . . would not be read to refer obviously to Jackson *even if the statements were the first piece of evidence at the trial.*" (emphasis added). The State bases this argument on the remainder of the sentence

from *Gray* that we quoted in the previous paragraph. In its entirety, the sentence reads:

The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial.

*Id.* Based on this sentence, the State argues, "Any significance to the purchase of a Little Debbie cake had to be developed through the trial evidence."

In *Henson,* our supreme court found a *Bruton* violation because "the jury could infer from the face of Reid's confession *without relying on any other evidence,* that the confession referred to and incriminated Henson." 407 S.C. at 166, 754 S.E.2d at 514 (emphasis added). The *Henson* court explained that in *Holder,* similarly, "it was apparent the statement was referring to the appellant *even without considering any other evidence.*" 407 S.C. at 165, 754 S.E.2d at 514 (emphasis added). However, we do not read *Gray, Henson,* or *Holder* as the State asks us to do here—to forbid us from relying on other evidence to conclude a jury would infer Canty's statements incriminated Jackson on their face. In *Gray* itself, the Supreme Court relied in part on other evidence—the testimony of a police detective—introduced after the codefendant's confession. 523 U.S. at 188–89, 193, 118 S.Ct. at 1153, 1155, 140 L.Ed.2d at 298, 301. In *State v. Johnson,* 390 S.C. 600, 703 S.E.2d 217 (2010), our supreme court relied on an investigator's testimony that the defendant's arrest was based in part on the codefendant's statement in finding a *Bruton* violation. 390 S.C. at 605, 703 S.E.2d at 219.

Other courts have relied on evidence outside the four corners of the codefendant's statement to find a *Bruton* violation. In *United States v. Hoover,* 246 F.3d 1054 (7th Cir.2001), the Seventh Circuit found the phrases "incarcerated leader" and "unincarcerated leader" in a codefendant's redacted statement were "obvious standins" for Hoover and Shell, two gang members. 246 F.3d at 1059. In doing so, the court relied on other evidence introduced at trial showing Hoover ran the gang from within prison, while Shell "was Hoover's ambassador on the outside." *Id.* Based on this evidence, the court

concluded, "Only a person unfit to be a juror could have failed to appreciate that the 'incarcerated leader' and 'unincarcerated leader' were Hoover and Shell." *Id.* The court explained its reliance on other evidence, stating, "Very little evidence is incriminating when viewed in isolation; even most confessions depend for their punch on other evidence. To adopt a four-corners rule would be to undo *Bruton* in practical effect." *Id.*

We discuss *Hoover* not because it is directly on point,[7] but because it illustrates that a court may consider evidence other than the codefendant's statement in determining whether a *Bruton* violation occurred. *See also United States v. Schwartz,* 541 F.3d 1331, 1351–52 (11th Cir.2008) (finding a *Bruton* violation "[e]ven though [the codefendant]'s statement 'was not incriminating on its face, and became so only when linked' with other evidence" because the statement named the defendant's "corporations after the jury had heard lengthy testimony regarding the extent of [the defendant]'s ownership and control of them" (quoting *Richardson,* 481 U.S. at 208, 107 S.Ct. at 1707, 95 L.Ed.2d at 186)); *United States v. Mayfield,* 189 F.3d 895, 902 (9th Cir.1999) (finding a *Bruton* violation because "the impermissible inference that [the codefendant] named Mayfield as the drug ringleader was unavoidable, if not on its face, then certainly in the context of the previously admitted evidence at trial"); *State v. Weaver,* 219 N.J. 131, 97 A.3d 663, 679 (2014) (stating a codefendant's statement admitted in violation of *Bruton* "cannot be considered in a vacuum" but must be "[c]onsidered in the context of the complete trial record").

Thus, we do not agree with the State's argument that this court may not consider other evidence in determining whether Canty's statements incriminated Jackson. Rather, the question before us is whether "the exact words used for redaction," in context with other evidence, "adequately obscured" "the reference to the defendant," *Holder,* 382 S.C. at 285 n. 3, 676

---

7. *Hoover* is different from Jackson's case in at least two respects. First, the redaction in *Hoover* functioned as a pseudonym—indeed, much like a nickname—while the identifying detail of Canty's statements is a description of a unique action Jackson took. Second, the inference identifying the defendant in the codefendant's statement was stronger in *Hoover* than it is here—so strong "[o]nly a person unfit to be a juror" could have missed it. *Id.*

S.E.2d at 694 n. 3, such that the jury would not "obviously" and "immediately" infer that Canty was referring to Jackson. *Gray*, 523 U.S. at 196, 118 S.Ct. at 1157, 140 L.Ed.2d at 303. We find they did not.

## 2. The Redaction of the Statements

The manner in which Canty's statements were redacted and the number of instances where Jackson's name was removed exacerbate the *Bruton* problem. Canty describes how "another person I know by another name came up to me and asked whether I wanted to be a part of robbing a pizza man." He also states he knew "[a]nother person was one of the males, and I didn't—and I don't know who the other two were." These clumsy substitutions invite the jury to speculate about the identity of the unnamed person Canty implicates in his statements. The Supreme Court discussed this effect in *Gray*, explaining "the obvious deletion may well call the jurors' attention specially to the removed name. By encouraging the jury to speculate about the reference, the redaction may overemphasize the importance of the confession's accusation—once the jurors work out the reference." 523 U.S. at 193, 118 S.Ct. at 1155–56, 140 L.Ed.2d at 301; *see also United States v. Jass,* 569 F.3d 47, 60 (2d Cir.2009) (stating "the Supreme Court's Confrontation Clause concern has been with juries learning that a declarant defendant specifically identified a co-defendant as an accomplice in the charged crime," which becomes too great a risk to the codefendant's right of confrontation "[o]nce a jury learns of a defendant's specific identification—whether through introduction of an unredacted confession, *or through a clumsy redaction that effectively reveals the fact* " (emphasis added) (internal citation omitted)).

The phrase "[a]nother person was one of the males," followed by "I don't know who the other two were," makes it clear Canty *did* know who "another person" was, and indicates that person's identity was intentionally removed from his statement. *See Gray*, 523 U.S. at 192, 118 S.Ct. at 1155, 140 L.Ed.2d at 301 ("Redactions that simply replace a name with an obvious blank space or . . . other similarly obvious indications of alteration . . . leave statements that, considered as a class, so closely resemble *Bruton* 's unredacted statements that, in our view, the law must require the same result."); 523

U.S. at 194, 118 S.Ct. at 1156, 140 L.Ed.2d at 302 (*"Bruton*'s protected statements and statements redacted to leave a blank or some other similarly obvious alteration function the same way grammatically."); *United States v. Taylor*, 745 F.3d 15, 29–30 (2d Cir.2014) (finding a redacted statement violated *Bruton* and *Gray* in part because "the wording of the statement suffers from stilted circumlocutions" that make it "obvious that names have been pruned from the text"); *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir.1999) (stating "if a redacted confession of a non-testifying codefendant . . . shows signs of alteration such that it is clear that a particular defendant is implicated, the Sixth Amendment has been violated").

We also find the frequent repetition of "another person" and "the other person" causes those phrases to lose their effectiveness in obscuring Canty's references to Jackson, and makes it more likely a jury would realize the original statements incriminated Jackson. Altogether, these phrases appear more than thirty times throughout Canty's six statements. The substituted phrases are not intertwined into the narrative structure, and they disrupt the syntax of the sentences. This excessive repetition creates an unnatural prose that draws the listener's attention to the redaction. Thus, a juror hearing the phrases would likely believe Canty's statements originally contained an actual name. *See United States v. Williams*, 429 F.3d 767, 773–74 (8th Cir.2005) (finding "the redaction of [the confessing codefendant]'s statement made it obvious that a name had been redacted" because: (1) there were "more than forty instances where [the nonconfessing codefendant]'s name was replaced with the word 'someone,'" (2) "[t]he replacements were not seamlessly woven into the narrative," and (3) "the neutral pronoun 'someone' may have lost its anonymity by sheer repetition"; and thus concluding "[i]t may well have been clear to the jury that the statement had obviously been redacted and that the 'someone' of the statement was [the nonconfessing codefendant]"); *United States v. Sandstrom*, 594 F.3d 634, 649 (8th Cir.2010) (applying *Williams* in a similar scenario).

### 3. The State's Reliance on the Statements

The State relied heavily on Canty's statements in arguing Canty committed the crimes. In so doing, the State asked the

jury to accept the statements as reliable. The State also asked the jury to accept its argument that Jackson committed the crimes with Canty. The only way the statements could be reliable, therefore, was if "the other person" referred to in the statements was Jackson. In other words, by asking the jury to convict Canty based in part on the reliability of his statements, and by asking the jury to convict Jackson too, the State was necessarily asking the jury to believe Canty was referring to—incriminating—Jackson. *See Gray*, 523 U.S. at 193, 118 S.Ct. at 1155, 140 L.Ed.2d at 301 ("A more sophisticated juror, wondering if the blank refers to someone else, might also wonder how, if it did, the prosecutor could argue the confession is reliable, for the prosecutor, after all, has been arguing that [the nonconfessing codefendant], not someone else, helped [the confessing codefendant] commit the crime."); *Henson*, 407 S.C. at 166, 754 S.E.2d at 514 ("The jury also could presume the solicitor would not both assert that Henson was the fourth conspirator and offer the confession into evidence if the solicitor believed the confession referred to anyone other than Henson.").

■ This is particularly true given that the State prosecuted Canty for murder under the accomplice liability doctrine of the hand of one is the hand of all. Under the hand of one doctrine, "one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose." *State v. Reid*, 408 S.C. 461, 472, 758 S.E.2d 904, 910 (2014).[8] To prove Canty guilty of murder under this doctrine, the State had to prove he "joined with another" to rob the pizza delivery man. The State presented circumstantial evidence—such as the surveillance video—that Canty and Jackson planned to do this. However, the strongest evidence the State presented to prove Canty "joined with another" in a "common design and purpose" was the evidence in Canty's statements. Moreover, to prove Canty guilty of murder under this doctrine, the State had to prove a participant in the agreed plan shot Flexon in executing their "common design

---

8. Donta Reid, the defendant in the cited case, was the nontestifying codefendant whose statements to police were found to violate Davontay Henson's right of confrontation when admitted at their joint trial. *Henson*, 407 S.C. at 157, 754 S.E.2d at 509.

and purpose." The only person this could have been was Jackson. Thus, for the State to successfully prove Canty guilty of murder under the doctrine of the hand of one is the hand of all, the person whose name was redacted from Canty's statements and replaced with the phrase "another person" had to be Jackson.

### 4. Unpreserved Issues

There are two additional issues, either of which possibly warrants reversal under *Bruton,* but neither of which is preserved for our review.

■ The first unpreserved issue involves Sergeant Burnish's testimony about his investigation of the crimes and Jackson's arrest. Sergeant Burnish described how he and Investigator West picked up Canty on January 15 and took him to the law enforcement center for questioning. There, Canty gave a statement to Investigator West. Sergeant Burnish explained he was not present when Canty gave this statement, but "was in the building." The solicitor then asked, "what happened and what did you do next in your investigation?" Sergeant Burnish answered, "Based on the information that was received on that date is when we issued warrants for the arrest of Mr. Jackson."

Jackson argues Sergeant's Burnish's testimony created a *Bruton* violation because it effectively told the jury that Canty named Jackson in his original, unredacted statements. *See Gray,* 523 U.S. at 188–89, 193, 118 S.Ct. at 1153, 1155, 140 L.Ed.2d at 298, 301 (finding a detective's testimony that he was able to arrest the defendant after his codefendant gave a confession "blatantly link[ed] the defendant to the deleted name" in the redacted confession introduced at trial); *Johnson,* 390 S.C. at 605–07, 703 S.E.2d at 219–20 (holding an investigator's testimony that he arrested the defendant based in part on a conversation in which a codefendant gave a confession "effectively told the jury" the unredacted confession named the defendant, and thereby created a *Bruton* violation).

However, Jackson never made any argument to the trial court as to the effect Sergeant Burnish's testimony had on the *Bruton* problem. In fact, the only times Jackson addressed

the merits of the alleged *Bruton* violation were in his pretrial motion to sever and when he renewed the motion on the first day of trial. At those points, the trial court could not have known Sergeant Burnish would connect Canty's statement to Jackson's arrest. When Jackson renewed his motion at the close of the State's case and the close of all evidence, he offered no new arguments in support of the alleged *Bruton* violation, and did not mention how Sergeant Burnish's testimony affected the issue. Therefore, we find unpreserved Jackson's argument that Sergeant Burnish effectively told the jury Canty's unredacted statements named Jackson.

■ The second unpreserved issue relates to the trial court's failure to instruct the jury not to consider Canty's statements in determining Jackson's guilt. A trial court's instruction to the jury that it may not consider a nontestifying defendant's confession against a codefendant is central to the right of the State to conduct a joint trial. *See Richardson,* 481 U.S. at 206–07, 107 S.Ct. at 1707, 95 L.Ed.2d at 185–86 (stating the Court's decision in *Bruton* created "a narrow exception" to "the almost invariable assumption of the law that jurors follow their instructions"); *Henson,* 407 S.C. at 162, 754 S.E.2d at 512 ("Historically, instructing the jury to consider a confession as only evidence against the confessing codefendant was considered sufficient under the Confrontation Clause, but in *Bruton* the United States Supreme Court dispensed with that fiction.").

■ The Eighth Circuit explained the necessity of a limiting instruction to protect the confrontation rights of defendants such as Jackson:

The Confrontation Clause dictates that "where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." There is a general assumption in the law, however, that juries follow their instructions. As such, the general rule is that "a witness whose testimony is introduced at a joint trial is not considered to be a witness against a defendant if the jury is instructed to consider that testimony only against a codefendant."

*United States v. Gayekpar,* 678 F.3d 629, 636 (8th Cir.2012) (internal citation omitted) (quoting *Richardson,* 481 U.S. at

206, 107 S.Ct. at 1707, 95 L.Ed.2d at 185). In *Gayekpar*, the Eighth Circuit found that although the redaction was sufficient, a *Bruton* violation occurred because the district court failed to give a limiting instruction. 678 F.3d at 637.

The Eighth Circuit was able to consider the trial court's failure to give a limiting instruction under the plain error rule. 678 F.3d at 637–38. We are constrained to find the issue unpreserved. *See State v. Sheppard,* 391 S.C. 415, 421, 706 S.E.2d 16, 19 (2011) (stating "the plain error rule does not apply in South Carolina state courts"); *State v. Evans,* 316 S.C. 303, 307 n. 1, 450 S.E.2d 47, 50 n. 1 (1994) (finding that when a defendant claiming a *Bruton* violation "did not request [a limiting instruction] nor make the argument [on appeal] that the failure to give a limiting instruction was error ..., [the argument] has been waived").

### III. Distinguishing Jackson's Case from Other Cases

The State cites numerous cases in which courts found no *Bruton* violation where the defendant's name or nickname was redacted from the nontestifying codefendant's statement and replaced with a neutral phrase like the ones used in this case—"another person" and "the other person." We find the cases cited by the State are distinguishable on their facts because the statements in those cases did not incriminate the codefendant on their face.

In *United States v. Vasilakos,* 508 F.3d 401 (6th Cir.2007), the government jointly tried five codefendants who participated in a mail fraud conspiracy. 508 F.3d at 405. Two of these codefendants, Vasilakos and Lent, appealed their convictions, arguing the district court erred by admitting into evidence deposition statements of their codefendants from civil proceedings. 508 F.3d at 406. Before introducing the statements, "the government replaced each reference to Vasilakos and Lent with a neutral word, such as 'the person' or 'another person.'" 508 F.3d at 408. The two appellants argued the admission of the statements violated their right of confrontation. 508 F.3d at 406. The Sixth Circuit disagreed. 508 F.3d at 408. The court explained the statements did not "ineluctably implicate Vasilakos or Lent" because "the government was prosecuting multiple defendants" and "alleged a multifac-

eted conspiracy in which several individuals engaged in activities" described in the depositions. *Id.*

In *Priester v. Vaughn*, 382 F.3d 394 (3d Cir.2004), the appellant sought habeas corpus relief for an alleged *Bruton* violation in his 1991 trial for murder. 382 F.3d at 395–96, 397.[9] The Third Circuit found no *Bruton* violation because the statements contained "no ... 'nicknames,' descriptions or phrases that directly implicate[d]" the appellant, and the phrases used for redaction were "bereft of any innuendo that ties them unavoidably to" him. 382 F.3d at 400–01.

The outcomes of *Vasilakos* and *Priester* are different from the result we reach today not because the Sixth Circuit and Third Circuit applied a different rule of law, but because the facts of those cases are distinguishable from the facts before us. This difference becomes clear by comparing *Vasilakos* and *Priester* to two other cases decided by those courts, both of which our supreme court found "persuasive" in *Henson: Richards* and *Stanford v. Parker*, 266 F.3d 442 (6th Cir.2001). *See Henson*, 407 S.C. at 165–66, 754 S.E.2d at 514. The State argues the outcomes of *Vasilakos* and *Priester* are different because the Sixth Circuit "limited" *Stanford* in *Vasilakos* and the Third Circuit "rejected" *Richards* in *Priester*. We disagree. Rather, we believe the courts reached different outcomes because each court's evaluation of the specific facts of that case required it. The different results of these cases are reconciled by a careful evaluation of their distinguishable facts.

A similar evaluation of specific facts also reconciles our decision today with our decision in *State v. McDonald*, 400 S.C. 272, 734 S.E.2d 167 (Ct.App.2012), *cert. granted in part,*

---

9. *Priester* is distinguishable from this case initially because it is an appeal from the denial of habeas corpus relief. As the Third Circuit explained, the cases upon which the appellant relied—*Gray* and *United States v. Richards*, 241 F.3d 335 (3d Cir.2001)—"were announced after [the] merits appeal was heard in the Pennsylvania Superior Court and it did not act unreasonably in failing to predict the Supreme Court's decision in *Gray*." 382 F.3d at 400. Under the deferential standard of review the Third Circuit was required to apply, the appellant was not entitled to relief unless the state court's "adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 382 F.3d at 397 (emphasis removed) (quoting 28 U.S.C. § 2254(d)).

(Feb. 21, 2014). In that case, the State tried McDonald together with his two codefendants—Whitehead and Cannon—for murder and burglary. 400 S.C. at 274, 734 S.E.2d at 168. Cannon gave a statement admitting his, Whitehead's, and McDonald's involvement in the crimes. 400 S.C. at 274, 734 S.E.2d at 167. After the State redacted Cannon's references to Whitehead and McDonald by replacing their names with the phrase "another person," the trial court allowed the statement into evidence. 400 S.C. at 276–77, 734 S.E.2d at 169. We carefully evaluated the statement, the redaction, and the context in which the State presented the statement at trial—as *Holder* required—and concluded the redacted statement incriminated only Cannon, not McDonald. 400 S.C. at 278–79, 734 S.E.2d at 170.

*McDonald,* like other cases cited by the State,[10] is based on its unique facts. We can reconcile *McDonald* with this case

10. In each case cited by the State to support its position that neutral phrases such as those used in this case do not offend the Sixth Amendment, the court ruled on the facts of that case the co-defendant's statements did not incriminate the defendant. Each case, therefore, is distinguishable on its facts from the case before us. *See, e.g., United States v. Lighty,* 616 F.3d 321, 377 (4th Cir.2010) (finding the redacted statement was like that in *Akinkoye, infra,* and unlike that in *Gray* because "it would have been unclear to the jury that the statements had been altered at all"); *Jass,* 569 F.3d at 58, 61–64 (holding a redacted confession did not violate the defendant's right to confrontation "[b]ecause the redacted statements neither manifested obvious indications of alteration, nor otherwise signaled to the jury that the statements had originally contained actual names," and finding the "confession was not obviously altered to omit the specific identity of" the nonconfessing codefendant (internal quotation marks and citations omitted)); *United States v. Logan,* 210 F.3d 820, 821–23 (8th Cir.2000) (examining the redaction "another individual," concluding "there was no indication whatever that there had been a redaction," and pointing out "the allegedly offending phrase occurred only once"); *United States v. Verduzco–Martinez,* 186 F.3d 1208, 1214–15 (10th Cir.1999) ("[c]onsidering [the nontestifying codefendant]'s redacted statements as a whole" and finding "the use of the neutral pronoun/phrase 'another person' did not identify [the nonconfessing codefendant] or direct the jury's attention to him, nor did it obviously indicate to the jury that the statements had been altered"); *Akinkoye,* 185 F.3d at 198 (finding no *Bruton* violation because "the jury neither saw nor heard anything in the confessions that directly pointed to the other defendant"); *United States v. Edwards,* 159 F.3d 1117, 1125–26 (8th Cir.1998) (finding "the district court's decision to admit nontestifying defendant admissions, redacted as to codefendants by the use of pronouns and other neutral words"

despite the use of the same neutral phrase for redaction—
"another person." First, the trial court in *McDonald* gave the
jury a limiting instruction. 400 S.C. at 278, 734 S.E.2d at 170.
Second, Cannon's statement in *McDonald* did not contain a
vivid description of a unique act by his codefendant, as Canty's
statement did with his description of Jackson purchasing a
Little Debbie cake. Had the State removed Canty's reference
to the purchase of the Little Debbie cake, which was virtually
unnecessary to convict Canty, this case may very well have
turned out like *McDonald.* In addition, although Cannon's
redacted statement used the phrase "another person" twenty-
one times, 400 S.C. at 277–78, 734 S.E.2d at 169–70, no single
use of the phrase created an awkward sentence construction
as did the redaction of Canty's statement. Thus, the fact of
redaction was far less obvious in *McDonald* than here.

Under the facts of this case, primarily the description of
"another person" purchasing the Little Debbie cake, Canty's
redacted statements incriminated Jackson by obvious and
immediate implication. Under the facts of *McDonald,* howev-
er, Cannon's redacted statement did not incriminate his code-
fendant.

### IV. Admission of Canty's Statements Was Not Harm-
less

■ The State argues that even if the trial court erroneous-
ly admitted the statements in violation of the Confrontation
Clause, their admission did not constitute reversible error.
We disagree.

■ Confrontation Clause violations are subject to a harm-
less error analysis. *Holder,* 382 S.C. at 285, 676 S.E.2d at 694.
"In the context of Confrontation Clause violations through the

was not a *Bruton* violation because it was consistent with *Gray* and
other cases allowing redacted confessions into evidence "so long as the
redacted confession or admission does not facially incriminate or lead
the jury directly to a nontestifying declarant's codefendant"); *State v.
Garrett,* 350 S.C. 613, 620–21, 567 S.E.2d 523, 526–27 (Ct.App.2002)
(determining no Confrontation Clause violation occurred because the
redacted statement removed specific mention of the nonconfessing
codefendant and "was limited in scope to events occurring the night of
the crime in question," and thus based on the specific facts of that
case).

admission of a codefendant's confession, the harmless error standard has been formulated as: 'In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.'" *Henson*, 407 S.C. at 167, 754 S.E.2d at 515 (quoting *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340, 344 (1972)).

We find the admission of the statements prejudiced Jackson and contributed to his guilty verdict, and the remaining evidence against Jackson was not overwhelming. First, the statements were the only direct evidence Jackson planned the robbery, called Sambino's, and shot Flexon. No other witness or evidence identified Jackson as the person who asked Canty to rob a pizza man, and the statements were the only eyewitness account of the shooting. Second, the State emphasized the statements throughout trial, especially during its closing argument. Finally, the trial court did not give the jury a limiting instruction that it may consider the statements only against Canty. As the Eighth Circuit noted in *Gayekpar*, "[w]ith no cautionary instruction, the jury was free to consider [Canty]'s statements when it decided the sufficiency of the [State]'s case against [Jackson]." 678 F.3d at 637.

We acknowledge the remaining evidence tending to establish Jackson's guilt is strong. However, the evidence is purely circumstantial, and we do not believe this "properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Henson*, 407 S.C. at 167, 754 S.E.2d at 515 (internal quotation marks and citation omitted). *See also* 407 S.C. at 158, 167, 754 S.E.2d at 510, 515 (finding a *Bruton* violation and concluding the error was not harmless, even where two coconspirators testified Henson was the shooter and gave other testimony corroborating the State's evidence against him); *State v. Singleton*, 303 S.C. 313, 314–15, 400 S.E.2d 487, 487–88 (1991) (finding a *Bruton* violation and concluding the error was not harmless, even where "[t]he victim testified that appellant walked up to his car, pointed a pistol in the car and demanded

he turn over his money"); *Edmond v. State,* 341 S.C. 340, 349, 534 S.E.2d 682, 687 (2000) (concluding "evidence of petitioner's guilt was not overwhelming as the State's entire case was built on circumstantial evidence").

We conclude the admission of Canty's statements was not harmless error.

## V. Conclusion

We find the admission of Canty's redacted statements violated Jackson's right of confrontation under the Sixth Amendment and was not harmless error. We **REVERSE** and **REMAND** for a new trial.[11]

SHORT, J., concurs.

GEATHERS, J., concurring in a separate opinion.

I concur in the majority's conclusions that the admission of Canty's redacted statements was a *Bruton* violation and the violation was not harmless beyond a reasonable doubt. However, I do not agree that a juror hearing the statements would have to consider evidence outside the four corners of the statements in order to infer that Canty was referring to Jackson. Further, I do not agree that had the State removed Canty's reference to the purchase of the Little Debbie cake, this case may have turned out like *State v. McDonald,* 400 S.C. 272, 734 S.E.2d 167 (Ct.App.2012), *cert. granted in part* (Feb. 21, 2014). The blunt and repetitive substitutions of "another person" or "the other person" for Jackson's name, especially "Another person was one of the males, . . . and I don't know who the other two were," were obvious redactions that "performed the same accusatory function as using the defendant's name." *State v. Henson,* 407 S.C. 154, 163, 754 S.E.2d 508, 513 (2014) (discussing the State's substitution of obvious blanks for the defendant's name in *Gray v. Maryland,*

---

**11.** Jackson also appeals the trial court's refusal to quash the jury panel pursuant to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Because we find a reversible Confrontation Clause violation occurred, we need not address this issue. *See Henson,* 407 S.C. at 168 n. 4, 754 S.E.2d at 515 n. 4 (declining to address a remaining issue because the court's determination of the Confrontation Clause issue was dispositive).

523 U.S. 185, 193–94, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998)). These substitutions, by themselves, impermissibly refer to Jackson's existence because they "obviously refer directly to someone," *Gray,* 523 U.S. at 196, 118 S.Ct. 1151, and Jackson was Canty's sole co-defendant.

## APPENDIX: Text of Canty's Fifth Statement

This appendix contains the text of Canty's fifth statement as Investigator West read it to the jury. We have omitted objections and other interruptions so that what appears below is simply the text of the statement:

> I was standing by the mailbox of the O.C. Mobile Home Park when another person I know by another name came up to me and asked whether I wanted to be a part of robbing a pizza man, and I said yes because I didn't want the other guys to laugh and pick at me. Another person told me to ask my cousin to take us to the store. I was going to get the—I was going to get batteries. My cousin name is Desmond Canty. He told me he was going to call Sambino's and order some pizzas. We went to Cherryvale Grocery. Another person used the pay phone right next to the trash can, green, and called Sambino's. Another person ordered three large pizzas. Pepperoni and cheese is all heard he asked for. We went—we then went into the store. I looked for the batteries, but they didn't have any. Another person brought a Debbie snack cake donut sticks. We went back to the house and we went into the back where the trash cans were, and I sat on a blue Caprice next to Toya's house. Toya stays next door to us. Toya left. I then went and sat on my porch until the pizza man came. I saw a silver in color Chrysler van pulled up, and it pulled up to the back where another person was—the other person was. The pizza man stayed in his vehicle for approximately three minutes, and he then—and then—he then got out and went to the abandoned residence, lot number 7, and saw the door open and turn around and went back to his vehicle real fast. The pizza man was met by three males with hoodies. Another person was one of the males, and I didn't—and I don't know who the other two were. The pizza man was trying to take the gun rifle away from the black male, and the black male told the pizza man to stop, and then the gun

fired.   After I saw the man got shot, I ran in the house and told my moms I heard a gunshot.